UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS

_____
                                          )
WANSHEN LI, QING SHI RUAN, and            )
SU QIN LI,                                )
                                          )
            Plaintiffs,                   )
                                          )   Civil Action No.
      v.                                  )   15-12961-FDS
                                          )
MW SOUTH STATION, INC.;                   )
AUBURN FOODS INC.; and DONALD             )
C. WONG,                                  )
                                          )
            Defendants.                   )
_____)

              **MEMORANDUM AND ORDER ON DEFENDANTS'**
              **MOTION FOR PARTIAL SUMMARY JUDGMENT**

**SAYLOR, J.**

This is an action seeking payment of back wages. From 2006 to 2013, plaintiffs worked as cooks and food preparers at Chinese fast-food restaurants called "China Wok." Defendants MW South Station, Inc., and Auburn Foods Inc., are the corporate owners of two China Wok restaurant locations in Boston and Auburn, Massachusetts. Defendant Donald C. Wong is the president of those corporations. Plaintiffs contend that their manager systematically altered their timecards to reflect fewer hours than they had actually worked, resulting in an underpayment of their wages. The complaint alleges claims under federal law for violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*, as well as under the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, §§ 148 and 150, and Massachusetts law requiring the payment of minimum wages, Mass. Gen. Laws ch. 151, §§ 1 and 20.

Defendants have moved for partial summary judgment concerning the minimum-wage

claims and certain claims that they contend are untimely. For the following reasons, defendants' motion will be granted in part and denied in part.

I.   **Background**

   A.   **Factual Background**

The following facts are taken in the light most favorable to plaintiffs.

MW South Station, Inc., and Auburn Foods, Inc. are corporate subsidiaries of the same parent corporation, Master Group, Incorporated. (Jonathan Wong Dep. at 4). Both operate Chinese fast-food restaurants called "Master Wok" at different locations. (Def. SMF ¶¶ 1–2). MW South Station operates a restaurant located at 100 Summer Street in Boston, Massachusetts ("Boston Master Wok"). (*Id.* ¶ 1). Auburn Foods operates a restaurant located at 385 Southbridge Street in Auburn, Massachusetts ("Auburn Master Wok"). (*Id.* ¶ 2). Donald C. Wong is the president of both corporations. (*Id.* ¶ 4).

Wanshen Li, Qin Shi Ruan, and Su Qin Li were formerly employed as cooks and food preparers at Boston Master Wok. (*Id.* ¶¶ 5–7).[1] Wanshen Li and Su Qin Li also worked at Auburn Master Wok. (Id. ¶¶ 5, 7). All three are Chinese immigrants and do not speak English. (Su Qin Li Aff. ¶ 1; Ruan Aff. ¶ 1; Wanshen Li Dep. 29).

Company policy at Master Wok required employees to punch a timecard at the beginning and end of each workday to record the hours worked. (Wanshen Li Dep. 47; Han Dep. 33).[2] At the end of each two-week pay period, employees signed their timecards and store managers sent them to a Master Wok central office in New Jersey for processing. (Ling Dep. 39; Jonathan Wong Dep. 22). If a timecard was sent to the central office without a signature, the office would

---

[1] The parties have used the American naming convention of placing family names last, rather than the Chinese convention, which places family names first. The Court will use the convention employed by the parties.

[2] It is not clear from the record whether salaried employees were also required to punch timecards.

return it to the restaurant location to be signed, which could result in a delay in payment. (Jonathan Wong Dep. 22; Ling Aff. 38).

Song Chun Ling was the manager at the Boston Master Wok from 2005 to the fall of 2013. (Ling Dep. 36; Su Qin Li Aff. ¶ 2). While she was manager, Ling consistently altered employee timecards, including those of plaintiffs. She testified that when she began managing the Boston China Wok, her manager informed her that it was one of her responsibilities to re-punch timecards for her employees. (Ling Dep. 36). Acting on that direction, she re-punched employee timecards periodically throughout the pay period, purportedly in order to make them appear more orderly. (*Id.* 22, 36–38). She had employees sign the cards she had re-punched before sending them to the central office for processing. (*Id*. 36–38). Ling explained that her reason for re-punching cards was that employees sometimes recorded their time in a sloppy manner, and that the central office would reject disorderly timecards, just as they would reject unsigned timecards. (*Id*.).

1. **Claims of Wanshen Li**

Wanshen Li worked as a cook at the Boston China Wok and Auburn China Wok, among other locations, from April 1, 2006, to August 4, 2013. (Def. SMF ¶ 5; Jonathan Wong Dep. 44).[3] He testified that he did not receive overtime payments while employed at China Wok, and instead the company provided him with a place to live, which a manager explained was "for [his] overtime." (Wanshen Li Dep. 44). The regional manager for the Boston region, Mei Juan Han, testified that she personally provided housing to some Master Wok employees, including Wanshen Li, in order to help retain employees, but that it was not a part of Master Wok policy to

---

[3] There is evidence that in December 2006, Wanshen Li was promoted from cook to kitchen manager, and transitioned from working on an hourly basis to a salary basis at that time. (Def. Ex. 3 ¶ 5; Ling Dep. at 39). Defendants do not rely on that fact and, accordingly, the Court does not use that change in employment status as a basis for its decision.

3

do so. (Han Dep. 42–43, 58–59, 70).

While Wanshen Li was working at the Boston China Wok location, he punched a timecard at the beginning and end of each day. (Wanshen Li Dep. 47– 48). He testified that for as long as he worked there, he saw Ling tear up the timecards employees had punched, and punch new cards on their behalf. (*Id.*). He signed timecards Ling had punched for him, although he knew they were "fake," because if he did not sign he "wouldn't get paid." (*Id.* 48–50). When asked why he did not complain that Ling was replacing his timecards, he responded, "Because she was the manager." (*Id.* 48).

Wanshen Li contends that he now knows that Song had been re-punching his timecard not only to make it appear neater, but also to subtract time for meal breaks that he had not actually taken. (*Id.* 47). At some point, although it is not clear when, servers who worked in the front of the store and had a better grasp of English informed him that time was being subtracted from his wages. (*Id.* 29). When he found out that China Wok had been subtracting time from his pay, he testified that he did not complain to anyone because "[l]ife back then was still very hard, so [he] just charged on, and . . . continued to work." (*Id.* 30). He contends that although he worked eleven-hour shifts throughout his employment, China Wok only paid him for nine hours each day. (*Id.* 29).

### 2. Claims of Qing Shi Ruan

Qing Shi Ruan worked as a cook at Boston China Wok from December 1, 2006, through October 31, 2013. (Def. SMF ¶ 6). It was the first job he held after immigrating to the United States. (Ruan Aff. ¶ 12). He testified that he saw Ling re-punch timecards prior to submitting them to the central office. (Ruan Dep. 36). He also testified that he never punched out during lunch hours because he was not allowed to leave for lunch. (*Id.* 52). He stated that he, and all of

4

the other employees, were aware that Ling re-punched timecards, "but at the time nobody dare[d] speak up." (*Id.*). He explained that "in China where I came from, you simply do not question your manager." (Ruan Aff. ¶ 9). He also stated that he did not know about minimum wage and overtime laws, because such laws do not exist in China. (*Id*. ¶ 10).

Ruan contends that he was not paid for two hours of work each day because Ling re-punched his timecard to reflect meal breaks that he had not taken. (*Id.* ¶ 7). Similarly to Wanshen Li, he contends that he first discovered the underpayment sometime in June or July of 2013, when servers informed him that Master Wok was not paying him for work it counted as breaktime. (*Id*. ¶ 2).

### 3. **Claims of Su Qin Li**

Su Qin Li worked at Boston China Wok and Auburn China Wok from May 8, 2006, to August 2015. (Def. Ex. 2 ¶ 2). Her duties included preparatory work, such as cutting meats and vegetables, as well as cleaning the kitchen and front areas. (*Id.* ¶ 8A).

Like Wanshen Li and Ruan, Su Qin Li testified that she saw Ling changing her timecard "consistently." (Su Qin Li Dep. 30–31). She contends that she typically worked 11-hour shifts, for a total of 65 hours of work each week, but that she was not compensated for five-and-a-half hours of work that was deducted for meal breaks. (*Id.* 31–32). She first learned that China Wok was deducting hours from her pay in September 2013, when she overheard one Master Wok server telling another that "Master Wok is shortchanging its employees." (Su Qin Li Aff. ¶ 3). She testified that she had never punched out for a break, lunch, or any reason other than leaving at the end of the day. (*Id.* 30). She testified that she never complained to Ling about the lack of breaks because she "thought it was the right thing." (*Id.* 38). She stated, "I thought that was how it was in the back; that when she asked us to go to work, that we'd go to work." (*Id.*).

5

### 4.     Labor-Law Sign Postings

Federal regulations require that employers such as Boston China Wok and Auburn China Wok post signs alerting employees to their rights under the labor laws. (*See* 29 C.F.R. § 516.4). Han, the regional manager, testified unequivocally that such signs were posted at the Boston and Auburn locations. (Han Dep. 60). She stated that the signs were initially posted only in English, but that Chinese signs were later posted at some locations. (*Id.* 61–62). The Vice President and Director of Operations for Master Group testified that he did not remember seeing labor-law signs posted in restaurants, but qualified that statement by saying that he "wasn't looking for [them]." (Jonathan Wong Dep. 66). Ruan stated that he could not recall seeing labor-law signs posted at Boston China Wok; however, he further explained that even if such signs had been posted, he would have had difficulty comprehending them no matter the language in which they were written because he does not speak English and cannot read Chinese well. (Ruan Aff. ¶¶ 9–11).

### 5.     Payroll Records

In support of their motion, defendants have provided some payroll records for Su Qin Li and Ruan; they have not provided any records for Wanshen Li.

As to Su Qin Li, defendants have submitted paystubs from ten pay periods from November 6, 2006, through March 25, 2007. (Def. Ex. 9). Those records reflect that she was paid a regular rate for the first forty hours of work each week, and an overtime rate of one-and-a-half times the regular rate for hours worked over forty. (*Id.*). Her regular rate started at $7.50 and increased to $8.05 in March 2007. (*Id.*). Her overtime rate likewise increased from $11.25 to $12.08. (*Id.*). In eight of the ten pay periods, Su Qin Li was paid for forty hours at her regular rate and for exactly ten hours at her overtime rate each week. (*Id.*).

As to Ruan, defendants have provided a single paystub for the pay period ending December 30, 2007. (Def. Ex. 10). Ruan's paystub also reflects that he worked exactly 50 hours each week. (*Id.*). His regular rate was $8.30 per hour and his overtime rate was $12.45 per hour. (*Id.*). Defendants have also submitted a copy of his timecard for a pay period in December (it is unclear as to what year). (*Id.*). The two weeks reflected on the timecard indicate that on five of six days worked, Ruan punched in at exactly 10:00 a.m., punched out at exactly 9:00 p.m., and took precisely a one-hour lunch break between 2:00 p.m. and 3:00 p.m. (*Id.*). On the sixth day, it indicates that Ruan punched in at exactly 10:00 a.m. and out at 3:00 p.m., with no breaks indicated. The card is written in English, but states only the days of the week and the words "in" and "out," and otherwise uses number to reflect Ruan's time. (*Id.*).

B.    **Procedural Background**

On July 16, 2015, plaintiffs Wanshen Li and Qing Shi Ruan filed the complaint in this action. The complaint alleges claims under the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, as well as under the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, §§ 148 and 150, and Massachusetts law requiring the payment of minimum wages, Mass. Gen. Laws ch. 151, §§ 1 and 20. On November 11, 2015, plaintiffs amended the complaint to add Su Qin Li as an additional plaintiff.

Defendants have moved for partial summary judgment as to (1) the state-law minimum-wage claims and (2) claims arising before July 16, 2012, which they contend are time-barred.[4]

---

[4] The motion also sought summary judgment concerning two other claims.

First, it sought summary judgment concerning all claims pleaded against BSC Corner Mall, Inc. At the hearing concerning this motion on April 18, 2017, the Court granted summary judgment in favor of BSC Corner Mall. (Docket No. 48).

Second, the motion stated that summary judgment should be granted "as to the . . . overtime claims." Defendants, however, have not provided any argument in support of that contention, and have failed even to cite the

## II. Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotations omitted). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256–57.

## III. Analysis

### A. Claim for Minimum-Wage Violations

Defendants first contend that they are entitled to summary judgment on the minimum-wage claims. Under Mass. Gen. Laws ch. 151, § 20, if a person is paid "less than the minimum fair wage to which the person is entitled under . . . a minimum fair wage regulation," he or she

---

statute that requires payment of overtime. Accordingly, insofar as defendants have moved for summary judgment as to plaintiffs' overtime claims brought pursuant to 29 U.S.C. § 207, that motion will be denied.

may recover treble the full amount due, applying the minimum-wage rate less any amounts paid, costs, and reasonable attorneys' fees.

The minimum wage in Massachusetts is currently $11 per hour, but it has changed on multiple occasions since plaintiffs began working at China Wok restaurants. Mass. Gen. Laws ch. 151, § 1. In 2006, the minimum-wage rate was $6.75; in 2007, it increased to $7.50; in 2008, it increased to $8. *See* An Act Increasing the Minimum Wage, 2006 Mass. Acts 271, §§ 1–4. It remained at $8 until 2015, when it increased to $9. *See* An Act Restoring the Minimum Wage and Providing Unemployment Insurance Reforms, 2014 Mass. Acts 144, §§ 28, 77.

Defendants contend that plaintiffs' paystubs demonstrate that they were paid in accordance with minimum-wage laws. In support of that contention, they have submitted ten paystubs for Su Qin Li from 2006 to 2007, and one paystub for Ruan from 2007. The records reflect that Ruan earned a regular rate of $8.30 per hour, and that Su Qin Li earned a regular rate of $7.50, increasing to $8.05 in March 2007. Both Ruan and Su Qin Li were paid an overtime rate of one-and-a-half times the regular rate for each hour worked in a week after the first forty.

Although the proffered records reflect that Ruan and Su Qin Li were paid a regular rate that equaled or exceeded the minimum wage at the relevant time, the complaint does not allege that plaintiffs were underpaid for hours for which payment was received. Instead, it alleges that they were not paid for approximately ten hours of work each week. Courts have taken two different approaches to analyzing claims for failure to pay the minimum wage base on non-payment of wages for certain hours. Under the first approach, adopted by at least two courts in this district, courts analyze the claims on an hour-by-hour basis, finding that non-payment for each hour violates minimum-wage laws because it effectively constitutes a wage of $0 for that hour. *See Norceide v. Cambridge Health All.*, 814 F. Supp. 2d 17, 24–26 (D. Mass. 2011); *Cruz*

9

*v. Boston Litig. Sols.*, 2016 WL 3568254, at *11 (D. Mass. May 24, 2016). Other courts have used a weekly-average approach, analyzing whether the total weekly compensation divided by the number of hours worked exceeded the minimum wage. *See, e.g., United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 490 (2d Cir. 1960). Here, under either method, defendants have not demonstrated that summary judgment should be granted as to plaintiffs' minimum-wage claims.

As to Su Qin Li, defendants have provided paystubs reflecting that she was paid a regular rate of $7.50 for the first forty hours, and an overtime rate of $11.25 for up to 10 hours in 2006 and 2007. (Def. Ex. 9). Her total weekly wages for work during that period were, at most, $412.50. (*Id.*). She contends that she actually worked about 65 hours per week. (Def. Ex. 2 ¶ 4A). Taking her testimony as true and drawing all reasonable inferences in her favor, her average hourly compensation for the weeks for which paystubs have been provided was $6.35 per hour, or less than the minimum wage in 2006 and 2007.

As to Ruan, defendants have provided a single paystub for the pay period ending December 30, 2007. (Def. Ex. 10). The paystub reflects a regular rate of $8.30 per hour and an overtime rate of $12.45 hour, for a total payment of $456.50 each week. (*Id.*). Ruan contends that he actually worked 60.5 hours each week, resulting in an average weekly wage of $7.55 per hour. (*Id.*, Ruan Aff. ¶ 3). Although that amount is slightly higher than the applicable minimum wage of $7.50 for 2007, the minimum wage increased to $8.00 two days after that pay period ended. *See* 2006 Mass. Acts 271, §§ 2, 4. Again, drawing all reasonable inferences in favor of Ruan, defendants' submission of a single paystub demonstrating that his weekly-average wage was slightly higher than the minimum wage just prior to an increase in the minimum wage is not an adequate basis upon which to grant summary judgment.

Last, as to Wanshen Li, defendants have not provided any payroll records or other evidence in support of their contention that he was paid an adequate minimum wage. (Wanshen Li Dep. 31). In the absence of any evidence in support of that contention, summary judgment will be denied as to him.

Accordingly, the motion for summary judgment will be denied concerning the minimum-wage claims under Count Three.

### B.  Statute of Limitations

The limitations period for bringing a claim for a willful violation of the FLSA is three years. 29 U.S.C. § 255(a).[5] Similarly, Massachusetts statutes prohibiting non-payment of wages and requiring the payment of a minimum wage impose a three-year limitations period. Mass. Gen. Laws ch. 149, § 150; Mass. Gen. Laws. ch. 151, § 20A.[6] Therefore, plaintiffs' claims concerning wages paid prior to July 16, 2012, appear to be untimely. Plaintiffs, however, contend that those limitations periods should be equitably tolled under the discovery rule.

#### 1.  Equitable Tolling of Federal Claims

Federal common law governs equitable tolling of the federal claims here. *See Salois v. Dime Sav. Bank of N.Y., FSB*, 128 F.3d 20, 25 (1st Cir. 1997). Under federal law, equitable tolling should be applied "sparingly," *Bonilla v. Muebles J.J. Alvarez, Inc.*, 194 F.3d 275, 278 (1st Cir. 1999), and "if [it is] available at all, [it] is the exception rather than the rule," *Delaney v. Matesanz*, 264 F.3d 7, 14 (1st Cir. 2001). The plaintiff bears the burden of establishing that equitable tolling is justified. *See Vazquez-Rivera v. Figueroa*, 759 F.3d 44, 50 (1st Cir. 2014).

---

[5] Defendants assume for the purposes of this motion that the three-year limitations period for willful violations of the Fair Labor Standards Act applies, rather than the two-year period for other violations. 29 U.S.C. § 255(a).

[6] In 2014, the limitations period under Mass. Gen. Laws ch. 151, § 20A for state-law minimum-wage claims was extended from two years to three years. *See* An Act Establishing Uniform Wage Compliance and Record Keeping, 2014 Mass. Acts 292, § 3.

For some—but not all—types of claims, a limitations period may be equitably tolled under the "discovery rule." *Merck & Co. v. Reynolds*, 559 U.S. 633, 644 (2010). Under that rule, the limitations period is tolled to the date "when the plaintiff knew, or reasonably should have known, about the injury that is the basis of his cause of action." *Young v. IMO Indus., Inc.*, 541 F. Supp. 2d 433, 454 (D. Mass. 2008). In other words, where the discovery rule applies, a cause of action accrues when a plaintiff had actual knowledge of the facts constituting a violation, or when "a hypothetical reasonably diligent plaintiff" would have discovered those facts. *Merck & Co. v. Reynolds*, 559 U.S. at 646–47.

The First Circuit has not determined whether FLSA claims are subject to equitable tolling under the discovery rule. Other courts that have examined that question have not reached a consensus. *See, e.g., Gessele v. Jack in the Box, Inc.*, 6 F. Supp. 3d 1141, 1152 (D. Or. 2014), *as amended* (May 15, 2014) (finding that "the discovery rule does not apply to claims under the FLSA"); *Koehler v. Freightquote.com, Inc.*, 93 F. Supp. 3d 1257, 1267 (D. Kan. 2015) (collecting cases finding that equitable tolling applies to FLSA claims). For the reasons that follow, equitable tolling would not be warranted in any event, and therefore it is unnecessary to resolve the question of whether the discovery rule applies to the FLSA claims asserted here. *See Abate v. D.C.*, 659 F. Supp. 2d 156, 159 n.5 (D.D.C. 2009) (declining to resolve issue of whether discovery rule applies to FLSA claims).

Plaintiffs advance two arguments to justify equitable tolling under the discovery rule. First, they contend that equitable tolling is justified because defendants failed to post signs at China Wok locations informing employees of their rights under the FLSA as is required by regulation. *See* 29 C.F.R. § 516.4. In support of their argument, plaintiffs point to cases holding that employers' failure to comply with similar regulations requiring the posting of signs under

the Age Discrimination in Employment Act ("ADEA"), 29 C.F.R. § 1627.10, and Title VII, 29 C.F.R. § 1601.30, is a relevant factor in considering whether to equitably toll the limitations period under those statutes. *Kale v. Combined Ins. Co. of Am.*, 861 F.2d 746, 752–53 (1st Cir. 1988); *Mercado v. Ritz-Carlton San Juan Hotel, Spa & Casino*, 410 F.3d 41, 46–47 (1st Cir. 2005). The limitations period under the ADEA and Title VII is significantly shorter than the limitations provided by the FLSA. 42 U.S.C. § 2000e-5(e)(1) (providing a 180- or 300-day limitations period for bringing Title VII claims); 29 U.S.C. § 626(d) (providing a 180- or 300-day limitations period for bringing ADEA claims). Although courts in this district have applied the framework developed for the ADEA and Title VII to the FLSA context, in light of the relatively long limitations period provided by the FLSA, there is at least some reason to doubt whether the analogy is apt. *See Roberts v. TJX Companies, Inc.*, 2017 WL 1217114, at *7 (D. Mass. Mar. 31, 2017).

Even if the court were to adopt that approach, plaintiffs have not presented evidence sufficient to create an issue of material fact as to whether they will be able to carry their "heavy burden" to prove that equitable tolling is justified. *Vazquez-Rivera v. Figueroa*, 759 F.3d at 50. None of the plaintiffs affirmatively testified that labor-law signs were *not* posted. Defendants have offered unequivocal testimony from a regional manager that signs were posted at the Auburn and Boston China Wok locations. Ruan testified that he could not recall seeing signs at Boston China Wok, but stated that he would not have been able to comprehend such signs because he does not speak English nor read Chinese. An employer representative testified that he did not remember seeing such signs, but stated that he "wasn't looking for [them]." That is not sufficient, under the circumstances, to create a material issue of disputed fact to defeat summary judgment on equitable-tolling grounds.

13

Next, plaintiffs contend that equitable tolling should apply because they did not know and could not reasonably have been expected to discover that they were not being paid all of the wages they were due. Plaintiffs testified that they discovered that they were being shortchanged when they were informed of that fact by co-workers who spoke better English. However, they also testified that, prior to that discovery, they consistently saw Ling changing their timecards and they signed off on cards that they knew were false. Plaintiffs testified that they did not complain about that practice because either they were afraid to do so, or because complaining about one's manager is not an accepted practice in China.

To warrant equitable tolling, plaintiffs must demonstrate that they were at least reasonably diligent in pursuing their claims. *See Guerrero-Santana v. Gonzales*, 499 F.3d 90, 94 (1st Cir. 2007). For present purposes, the Court will assume that plaintiffs did not complain because of cultural and language barriers, and possibly fear of employment reprisals. But the focus under the equitable-tolling inquiry is on whether the facts constituting the violation were susceptible of discovery by a reasonable person in the same position as the plaintiffs. Here, plaintiffs saw their manager re-punching their timecards consistently, signed timecards that clearly indicated different times than they had punched, and received paychecks every two weeks for substantially less than they were owed.[7] Insofar as plaintiffs contend that they could not understand the cards because they do not speak or read English, the essential facts concerning the violation—times in and out—are communicated in numerical form, and indeed the cards contain only minimal English writing. The Court is certainly sympathetic to plaintiffs' claims that they were systematically and substantially underpaid over a period of many years. However, by their

---

[7] For example, in 2006, Su Qin Li claims that she worked 65 hours each week, but her paystubs reflect that she was only paid for 50 hours of work. Because the additional fifteen hours would have been paid at her overtime rate, taking her claims as true, Su Qin Li was underpaid $168.75 each week during that period, or 41% of her total weekly salary of $412.50.

very nature, statutes of limitations prevent recovery even as to meritorious claims. In light of the lack of evidence offered by plaintiffs that their claims could not have been discovered by a reasonably diligent person, summary judgment will be granted as to the federal claim concerning wages paid prior to July 16, 2012.

## 2. Equitable Tolling of State-Law Claims

Massachusetts law applies to the analysis concerning equitable tolling of the state-law claims. *Salois*, 128 F.3d at 27–28 (1st Cir. 1997). In many ways, Massachusetts law concerning equitable tolling parallels federal law. As under federal law, under Massachusetts law, the plaintiff has the burden of showing "(1) that she lacked actual knowledge of the basis for her claim and (2) that her lack of knowledge was objectively reasonable." *Museum of Fine Arts, Boston v. Seger-Thomschitz*, 623 F.3d 1, 7 (1st Cir. 2010). Massachusetts courts have described the circumstances under which equitable tolling is justified as those where "the factual basis for the cause of action [was] 'inherently unknowable' at the time of the injury." *Geo. Knight & Co. v. Watson Wyatt & Co.*, 170 F.3d 210, 213 (1st Cir. 1999) (quoting *Tagliente v. Himmer*, 949 F.2d 1, 5 (1st Cir. 1991)).

Three distinctions between Massachusetts law and federal law are potentially relevant here. First, unlike the federal courts, Massachusetts courts have squarely held that claims concerning unpaid wages are subject to equitable tolling under the discovery rule. *See Crocker v. Townsend Oil Co.*, 464 Mass. 1, 8 (2012) (applying the discovery rule to Mass. Gen. Laws ch. 149, § 148 claim). Second, in Massachusetts, the question of whether a plaintiff reasonably should have known of the defendant's wrongful conduct is typically an issue for the fact-finder. *See Koe v. Mercer*, 450 Mass. 97, 101 (2007). Third, there is Massachusetts caselaw on point

15

concerning the type of conduct at issue here. *See Salvas v. Wal-Mart Stores, Inc.*, 452 Mass. 337 (2008).

In *Salvas v. Wal-Mart*, the Massachusetts Supreme Judicial Court considered claims for unpaid wages by a putative class of Wal-Mart employees. *Id.* at 338. The employees alleged that Wal-Mart managers "regular[ly]" inserted meal breaks of 30 or 60 minutes into employees' records, even though no breaks had been taken; clocked employees out of work after only one minute if the employees failed to punch out at the end of the day (resulting in employees being uncompensated for essentially entire shifts); and adjusted timecards to reflect precisely the number of hours scheduled if employees worked for longer than their scheduled shifts. *Id.* at 343 n.16–19. In that case, as here, plaintiffs argued that the limitations period for claims that had accrued more than three years prior to the filing date should be equitably tolled under the discovery rule. *Id.* at 376. The SJC concluded that allegations of such conduct were "sufficient to send to the jury the factual question whether a reasonable hourly employee would or should have known that time was being shaved from their paychecks." *Id.* at 378.

The managers' conduct in *Salvas* is similar to that alleged here. Like the Wal-Mart employees, plaintiffs here contend that their manager regularly inserted meal breaks of sixty minutes, and re-punched their timecards to reflect that they had worked precisely their scheduled hours, rather than the hours actually worked. The *Salvas* decision is therefore directly on point.

Of course, it seems odd to conclude that the loss of many hours of wages each week—or, in the case of Wal-Mart employees, entire days of wages—was an "inherently unknowable" injury. Presumably, objectively reasonable employees would know the hours they actually worked, their hourly rate, and the amount they were paid. Knowledge of those facts alone suggests that plaintiffs' injury was not "incapable of detection . . . through the exercise of

16

reasonable diligence." *Tagliente*, 949 F.2d at 5. However, the *Salvas* opinion concluded the opposite, relying in large part on the fact that the wages of the Wal-Mart employees were low. *Salvas*, 452 Mass. at 378 n.74 (stating that "at minimum-wage wages . . . lost payment of four hours' labor was less than thirty dollars"). It is certainly more plausible that those facts should lead to the opposite conclusion: a reasonable minimum-wage worker would have had a heightened awareness of underpayment, because even small discrepancies could constitute a substantial share of his or her weekly income. In addition, the *Salvas* finding appears to be in some tension with caselaw cautioning that "one does not have to fully comprehend the full extent or nature of an injury in order for a cause of action to accrue." *Koe v. Mercer*, 450 Mass. at 102.

Nonetheless—and although it seems somewhat obvious that plaintiffs here had sufficient information to discover the injury underlying their claims—the Court does not write on a blank slate. The SJC's decision in *Salvas*, which concerns substantially the same type of conduct, controls. Therefore, the evidence offered by plaintiffs in opposition to the motion for summary judgment is "sufficient to send to the jury the factual question whether a reasonable hourly employee would or should have known that time was being shaved from [his or her] paycheck[]." *Salvas*, 452 Mass. at 378.

Accordingly, the motion for summary judgment will be denied as to plaintiffs' state-law claims concerning wages paid prior to July 16, 2012.

## IV. Conclusion

For the foregoing reasons, defendants' motion for summary judgment is GRANTED as to the claim under the Fair Labor Standards Act for wages paid prior to July 16, 2012, and is otherwise DENIED.

**So Ordered.**

                                                      /s/ F. Dennis Saylor  
                                                     F. Dennis Saylor IV  
Dated: June 2, 2017                         United States District Judge